**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | |
|---|---|
| **CYNTHIA A. LARGE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No.: |
| v. ) | |
| ) | REQUEST FOR JURY TRIAL |
| **SELCO, INC.** ) | |
| **d/b/a MOTORVILLE,** ) | |
| ) | |
| **Defendant.** ) | |

Serve Registered Agent:
Sandra K. Larson
9851 Lackman Road
Lenexa, Kansas 66219

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, Cynthia A. Large, and for her claims against the above-named Defendant, alleges and states as follows:

1. Plaintiff is, and at all times set forth below was, a resident of Olathe, Kansas.

2. Defendant is a corporation, organized under the laws of Kansas with its principal place of business in Lenexa, Kansas.

3. Defendant works in an industry affecting interstate commerce, in that Defendant distributes products which are shipped and used throughout the United States.

4. Defendant employed more than 15 employees in 2017, 2018 and 2019.

5. Defendant is thus subject to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331,

as Counts II of Plaintiff's Complaint arises under the laws of the United States, specifically the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

7. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Count I of Plaintiff's Complaint, as that count is so related to the claims encompassed within Counts II as to form one case or controversy.

## FACTS COMMON TO ALL COUNTS

8. Plaintiff was hired by Defendant on or about August 2, 2010.

9. Plaintiff worked in Defendant's facility as the Credit Manager.

10. On November 30, 2018, Plaintiff was hurt in the course and scope of her employment.

11. Plaintiff arrived at work at approximately 6:00 A.M.

12. As Plaintiff walked towards the entrance to Defendant's facility, she slipped on a large patch of black ice.

13. Plaintiff fell, hitting her left upper extremity and head on the pavement.

14. Plaintiff immediately experienced soreness in her left upper extremity and back.

15. Plaintiff immediately experienced intense head pain and a contusion on the back of her head.

16. Plaintiff was unable to get to her feet by herself.

17. Plaintiff used her mobile phone to call her coworker, CJ Maroney, to request help.

18. Maroney assisted Plaintiff helping Plaintiff to her feet and into Defendant's facility.

19. When Davin Larson ("DL"), the owner of Defendant, arrived that morning at approximately 8:00 A.M., Plaintiff immediately informed Larson of her fall.

20. DL only response was: "I'm sorry you fell."

21. Over the next several hours, the contusion on Plaintiff's head swelled larger and larger in size.

22. Defendant made no offer to take Plaintiff to the emergency room or urgent care for evaluation.

23. DL did begin referring to Plaintiff as "Lumpy," referencing the swollen contusion on the back of her head.

24. Plaintiff worked the rest of the day despite a persistent and extremely painful headache and left upper extremity pain.

25. Overnight, Plaintiff continued to experience persistent painful headaches.

26. The stiffness and soreness around Plaintiff's neck and left shoulder also increased greatly.

27. Due to the pain, Plaintiff sought medical treatment at urgent care department of Olathe Health Family Medicine - College Point.

28. Plaintiff did not believe it was safe for her to drive due to her headaches, and had to be transported to the medical center by her daughter.

29. Upon check in at the medical center, Plaintiff was asked about the location of the fall.

30. Plaintiff informed the healthcare provider's intake nurse that the fall had occurred at work.

31. The healthcare provider's intake nurse instructed Plaintiff to provide

Defendant's workers' compensation insurer's information as soon as possible.

32. Plaintiff said that she would get the information from Defendant on Monday, December 3, 2018.

33. Plaintiff was diagnosed with whiplash, a head contusion, a shoulder strain, and a concussion.

34. Plaintiff was instructed to take pain medications and rest.

35. On December 3, 2018, Plaintiff returned to work for her next scheduled shift.

36. Plaintiff provided the physician's report from her medical treatment to DL immediately upon his arrival at the facility.

37. DL informed Plaintiff that Defendant would have the workers' compensation insurance adjustor contact Plaintiff's doctor's office directly, rather than providing the insurance information to Plaintiff.

38. Throughout the day on December 3, Plaintiff struggled with the symptoms brought on by her work-related injury, including difficulty in concentrating and extreme pain in her head.

39. On December 4, 2018, Plaintiff was working.

40. Teri Larson ("TL"), Defendant's Human Resources Manager and wife of DL, stopped by Plaintiff's office.

41. TL asked Plaintiff how she was feeling.

42. Plaintiff informed TL that Plaintiff was still having headaches and was currently experiencing blurred vision as a result of those headaches.

43. TL stated that she had her own eye-health issues.

4

44. TL informed Plaintiff that Plaintiff "was better off" than TL was because of her condition.

45. On December 5, 2018, TL told Plaintiff that an incident report had been filed with Defendant's worker's compensation insurer.

46. However, no one asked Plaintiff for any information regarding how Plaintiff fell or what injuries she sustained.

47. Later that day, Plaintiff attempted to schedule a follow-up appointment in accordance with the discharge instructions she had received on December 1, 2018.

48. The doctor's office stated that they would not make an appointment for Plaintiff without knowing if she should be seeing a workers' compensation doctor.

49. This led Plaintiff to request information regarding workers' compensation claims from TL.

50. Defendant did not provide Plaintiff with the requested information.

51. Plaintiff followed up with an email to TL.

52. TL responded that she had left a message with the insurer and would get back to Plaintiff later.

53. Plaintiff continued to suffer from severe headaches and pain as she waited for Defendant to identify an authorized treating physician.

54. On December 12, 2018, Plaintiff was finally sent to an authorized provider, a nurse practitioner.

55. Plaintiff diagnosis of a concussion was confirmed, as well as a head contusion, cervical strain, thoracic strain, left shoulder strain, and muscle spasms.

56. Plaintiff was prescribed medications for her pain and symptoms.

57. Plaintiff was given work restrictions, which included:

    a. Length of shift not to exceed 6 hours;

    b. No more than 15 minutes per hour of screen time;

    c. Two 15-minute breaks per shift during which Plaintiff was to sit in a dark, quiet room;

    d. Lifting restrictions of no more than 10 pounds;

    e. No bending, stooping, or climbing ladders.

58. Plaintiff was also prescribed physical therapy over the next two weeks.

59. Plaintiff continued to report to work and complete her job duties with reasonable accommodations over the next three months.

60. Eventually, the authorized treatment provider recommended that Plaintiff see two separate specialists, one for her concussion and another for her shoulder injury.

61. Plaintiff retained legal counsel to represent her in the underlying workers' compensation claim in early March.

62. Plaintiff was scheduled for surgery to repair her torn rotator cuff, and the surgery was to be performed on March 7, 2019.

63. Just before her surgery, Plaintiff was provided specific instructions concerning her assignments during her recovery period following surgery.

64. DL instructed Plaintiff to put all of her job duties in writing

65. DL instructed Plaintiff, in writing, that Plaintiff was to call and check in on March 13, 2019, to report directly to DL what tasks she was medically cleared to perform.

66. Plaintiff was further instructed to call every three days following the March 13 call to provide recovery progress reports directly to DL.

67. These instructions, including outlining Plaintiff's job duties and submitting regular progress reports, were to ensure Plaintiff returned to work as soon as possible.

68. On March 7, 2019, Plaintiff underwent surgery on her left rotator cuff and left bicep.

69. On or about March 10, 2019, Plaintiff's legal counsel provided notice of representation in the underlying workers' compensation claim to Defendant.

70. On March 13, Plaintiff was placed on a single work restriction: no use of her left arm.

71. This restriction was considerably less onerous than the previous restrictions Plaintiff had been placed on.

72. Plaintiff could have performed the essential functions of her job without the use of her left arm.

73. On March 13, 2019, Plaintiff called DL as she had been instructed.

74. Plaintiff anticipated being told to return to work immediately based on her ability to complete her assignments despite her work restrictions.

75. Upon answering Plaintiff's call, DL was noticeably angry and upset.

76. Plaintiff greeted Larson and began to provide a status update regarding her restrictions.

77. DL immediately cut off Plaintiff from speaking, saying: "***Stop, stop! You are suing me***."

78. Plaintiff was taken aback by this comment.

79. Plaintiff stated that she had hired an attorney for the workers' compensation claim because Defendant had the insurance company advocating for it and she felt she

should have someone advocating for her.

80. DL told Plaintiff that she was not to contact him or anyone working for Defendant because "you are suing us."

81. On March 14, 2019, Plaintiff was notified via legal counsel that Defendant had no light duty work for Plaintiff.

82. During this time, Plaintiff's father had passed away.

83. At no time did any employee of Defendant reach out to Plaintiff to inquire how she was doing or offer any condolences regarding her father's passing.

84. Plaintiff had formed strong friendships with her coworkers after working for Defendant for nearly a decade.

85. Upon information and belief, DL instructed the employees of Defendant not to contact Plaintiff after he learned that Plaintiff had hired an attorney.

86. Over the next several months, Plaintiff continued post-surgical treatment, and began being allowed to use her left arm more and more.

87. Despite gaining more and more use of her left arm, Plaintiff was never allowed to return to work after March 7, 2019.

88. In late August 2019, Plaintiff anticipated a full release from care.

89. On August 26, 2019, Plaintiff sent an email to DL asking if she would be allowed to return to work in September.

90. Plaintiff needed to know if she was required to write Defendant a check to pay for her health insurance premiums or if that amount could be deducted from her paycheck once she returned to work.

91. Plaintiff also requested information regarding an accumulated paid-time off

she had, as her anniversary date of August 2 had passed while she was being kept from work.

92. DL responded to the email.

93. DL told Plaintiff he would not discuss these matters with her because she had hired an attorney.

94. DL instructed Plaintiff to communicate through the attorney.

95. In reality, the scope of representation was limited to the workers' compensation claim, not Plaintiff's employment.

96. DL wrote that Plaintiff had used all of her personal and vacation time during her post-surgery convalescence and Plaintiff would not be receiving her normal two weeks of vacation on August 2 because she hadn't worked.

97. Two days after receiving this email, DL sent Plaintiff a letter notifying Plaintiff that she was terminated.

98. The letter stated that while Plaintiff had been recovering, Defendant "evaluate[d] your position and reassign[ed] your duties to ensure business could go on as usual."

99. Based on this temporary reassignment of duties, Plaintiff's position had been eliminated.

100. Upon information and belief, Defendant had hired temporary employees to complete the tasks assigned to Plaintiff's position.

101. Following Plaintiff's discharge, Defendant posted a sign on its facility advertising that Defendant was hiring

102. Upon information and belief, Defendant had stopped using the temporary

she had, as her anniversary date of August 2 had passed while she was being kept from work.

92. DL responded to the email.

93. DL told Plaintiff he would not discuss these matters with her because she had hired an attorney.

94. DL instructed Plaintiff to communicate through the attorney.

95. In reality, the scope of representation was limited to the workers' compensation claim, not Plaintiff's employment.

96. DL wrote that Plaintiff had used all of her personal and vacation time during her post-surgery convalescence and Plaintiff would not be receiving her normal two weeks of vacation on August 2 because she hadn't worked.

97. Two days after receiving this email, DL sent Plaintiff a letter notifying Plaintiff that she was terminated.

98. The letter stated that while Plaintiff had been recovering, Defendant "evaluate[d] your position and reassign[ed] your duties to ensure business could go on as usual."

99. Based on this temporary reassignment of duties, Plaintiff's position had been eliminated.

100. Upon information and belief, Defendant had hired temporary employees to complete the tasks assigned to Plaintiff's position.

101. Following Plaintiff's discharge, Defendant posted a sign on its facility advertising that Defendant was hiring

102. Upon information and belief, Defendant had stopped using the temporary

employees and was hiring a replacement for Plaintiff's former position.

103. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

104. On or about November 7, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant engaged in discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

105. On or about January 31, 2020, the EEOC issued Plaintiff a Notice of Right to Sue and thereby closed the administrative matter associated with the Charge of Discrimination.

106. Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

### COUNT I - RETALIATION IN VIOLATION OF PUBLIC POLICY (KANSAS WORKER'S COMPENSATION ACT)

107. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 106 of her Complaint, as though fully stated herein.

108. Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

109. These rights included retaining legal counsel to represent her interests seeking workers' compensation benefits.

110. Defendant took adverse employment actions against Plaintiff, including but

not limited to:

    a. Refusing to allow Plaintiff to return to work despite work available that Plaintiff could perform;

    b. Penalizing Plaintiff for absences during the period for which Defendant prohibited Plaintiff from working;

    c. Refusing to communicate with Plaintiff about any aspect of her employment;

    d. Ostracizing Plaintiff by instructing employees not to contact Plaintiff for any reason; and

    e. Discharging Plaintiff from employment.

111. Defendant's adverse employment actions taken against Plaintiff were each based upon, and directly related to, Plaintiff exercising her rights granted by the Kansas Worker's Compensation Act.

112. Defendant's adverse employment actions against Plaintiff violate State public policy clearly declared by the Kansas Courts and the Kansas Legislature.

113. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

114. Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

115. Thus, an award of punitive and exemplary damages is appropriate.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, and for such other and further consideration and relief as the Court may deem just and equitable.

### COUNT II - DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et. seq.*

116. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 115 of her Complaint, as though fully stated herein.

117. Plaintiff suffered from physical impairments that substantially limited one or more of her major life activities, including but not her ability to work and lift.

118. Further, Defendant regarded Plaintiff's physical impairments as limiting Plaintiff from additional major life activities and for limiting Plaintiff from such activities for much longer than they actually did.

119. In reality, Plaintiff was always able to perform the essential job functions of her former position with reasonable accommodations.

120. Thus, Plaintiff suffered from a "disability" as defined by 42 U.S.C. § 12102(1).

121. Defendant took adverse employment actions against Plaintiff, including but not limited to:

   a. Denying Plaintiff reasonable accommodations;

   b. Prohibiting Plaintiff from returning to work despite her ability to perform all essential functions of her job;

   c. Punishing Plaintiff for absences which Defendant imposed on Plaintiff; and

   d. Discharging Plaintiff from employment.

122. Defendant's adverse employment actions taken against Plaintiff were each based upon, and directly related to, Plaintiff's disability, including disability wrongfully attributed to Plaintiff by Defendant.

123. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

124. Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

125. Thus, an award of punitive and exemplary damages is appropriate.

126. Further, Plaintiff is allowed to recover her costs and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, for attorneys' fees, for punitive damages, and for such other and further consideration and relief as the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,


 /s/ *Daniel L. Doyle*
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930, ext. 109
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
ATTORNEYS FOR PLAINTIFF

14